UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
STATE OF NEW YORK and BASIL SEGGOS, as :
Commissioner of the New York State Department of :
Environmental Conservation and Trustee of New York : **COMPLAINT**
State's Natural Resources, :
: **CASE NO. 2:17-cv-01146**
      Plaintiffs, :
:
                - against - :
:
P.A. INDUSTRIES, INC. A/K/A PLASTIC :
ASSOCIATES INC., METAL ETCHING CO., INC. :
A/K/A A.I.S. INDUSTRIES, INC., ARTHUR :
SCHUTZMAN A/K/A/ ARTHUR SCHULTZMAN, :
ALAN STERN, GLORIA STERN, MIRIAM :
SOMMERFIELD, FREEPORT CREEK ASSOCIATES, :
and FREEPORT CREEK ASSOCIATES, LLC, :
:
      Defendants. :
------------------------------------------------------------------ x

      Plaintiffs State of New York and Basil Seggos ("Seggos"), in his capacity as Commissioner of the New York State Department of Environmental Conservation ("DEC") and Trustee of New York State's Natural Resources (State of New York and Seggos together, the "State"), by their attorney Eric T. Schneiderman, Attorney General of the State of New York, as and for their Complaint, allege as follows:

## NATURE OF THE ACTION

      1.    This is an action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601-9675 ("CERCLA"), as amended, and New York common law to recover (a) costs that have been and will be incurred by the State in responding to the release and threatened release of hazardous substances into the environment at and from the premises located at 435 South Main Street, Freeport, New York ("the Site") and (b) damages to the State's natural resources caused by that release and threatened release.

2. This action seeks (a) recovery of the State's response costs incurred to date, and (b) a declaration of liability for the State's future response costs and damages for injury to the State's natural resources, including the costs of assessing the natural resource damages.

## JURISDICTION AND VENUE

3. This Court has exclusive jurisdiction over the First Claim for Relief, which arises under the laws of the United States, pursuant to 28 U.S.C. §§ 1331 and 2201 and 42 U.S.C. §§ 9607 and 9613. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the Second Claim for Relief, which is based upon New York common law and statutory law and arises out of a common nucleus of operative facts shared with the First Claim for Relief. The Court also has jurisdiction to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. § 9613.

4. Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the release and threatened release of hazardous substances that give rise to this action occurred and/or are occurring within this District and the Site is located within this District.

## THE PARTIES

5. Plaintiff State of New York brings this action to recover costs that have been and will be incurred by the State in responding to the release and threatened release of hazardous substances at and from the Site.

6. As Commissioner of DEC, Seggos has been designated the Trustee of New York State's Natural Resources under CERCLA, 42 U.S.C. § 9607(f)(2)(B). Seggos brings this action in his official capacity to recover damages for injury to the State's natural resources caused by the release and threatened release of hazardous substances at and from the Site.

7. Defendant P.A. Industries, Inc.[1] ("P.A. Industries") is a business corporation organized under the laws of New York. On information and belief, from 1973 or earlier to 1982, P.A. Industries operated a metal fabricating and decorating business at the Site as the parent company of Metal Etching Corp. or did business as Metal Etching Corp. On information and belief, P.A. Industries managed, directed, and conducted operations related to the disposal of hazardous waste at the Site, and made decisions about compliance with environmental laws and regulations.

8. Defendant Metal Etching Co., Inc.[2] ("Metal Etching Co.") is a business corporation organized under the laws of Delaware that was authorized to do business in New York until January 2012. On information and belief, from approximately 1982 through 1999, Metal Etching Co. leased the Site and operated a metal fabricating and decorating business at the Site.

9. Defendant Arthur Schutzman a/k/a Arthur Schultzman ("Arthur Schutzman") was President of P.A. Industries and later was President of Metal Etching Co. On information and belief, Arthur Schutzman managed, directed, and conducted operations related to the disposal of hazardous waste at the Site, and made decisions about compliance with environmental laws and regulations.

10. On information and belief, Defendant Alan Stern was an employee of P.A. Industries and President of Metal Etching Co. On information and belief, Alan Stern managed, directed, and conducted operations related to the disposal of hazardous waste at the Site, and made decisions about compliance with environmental laws and regulations.

---

[1] On information and belief, P.A. Industries, Inc. is also known as Plastic Associates Inc.
[2] On information and belief, Metal Etching Co., Inc. is also known as A.I.S. Industries, Inc.

11. Defendant Gloria Stern owned the Site in a partnership with Miriam Sommerfield from November 1986 through February 1987.

12. Defendant Miriam Sommerfield owned the Site in a partnership with Gloria Stern from November 1986 through February 1987.

13. Freeport Creek Associates was a partnership ("Freeport Creek Associates Partnership") that purchased the Site in February 1987. Miriam Sommerfield was a partner in Freeport Creek Associates Partnership, and on information and belief Gloria Stern was also a partner in Freeport Creek Associates Partnership.

14. Defendant Freeport Creek Associates, LLC is a limited liability company organized under the laws of the State of New York and on information and belief is the current owner of the Site, although it legally dissolved in 2002. Freeport Creek Associates Partnership converted to Freeport Creek Associates, LLC in 1994.

## STATUTORY AND REGULATORY BACKGROUND

### CERCLA

15. CERCLA provides that when there is a release or a threatened release of hazardous substances into the environment from a facility, certain categories of persons are liable to the State for (a) the costs that the State incurs to respond to the release or threatened release as long as the State's response actions are "not inconsistent with the national contingency plan," and (b) "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." 42 U.S.C. § 9607(a).

16. "Hazardous substances" are defined in 42 U.S.C. § 9601(14) to include substances that the EPA has designated as hazardous pursuant to 42 U.S.C. § 9602. The substances that EPA has designated as hazardous are listed in 40 C.F.R. § 302.4.

17. A "release" includes spilling, leaching, and disposing "into the environment." *Id.* § 9601(22). The "environment" includes groundwater, land surface, and subsurface strata. *Id.* § 9601(8).

18. A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). It also includes buildings, structures, and equipment. *Id.*

19. The term "respond" includes taking "removal" actions, "remedial" actions, and related enforcement activities. *Id.* § 9601(25). A "removal" action includes the "cleanup or removal of released hazardous substances from the environment" and the assessment and evaluation of a release. *Id.* § 9601(23). A "remedial" action means "those actions consistent with permanent remedy taken instead of or in addition to removal actions." *Id.* § 9601(24).

20. The "national contingency plan" is set forth in 40 C.F.R. Part 300.

21. "Natural resources" include land and groundwater. *Id.* § 9601(16).

22. The contamination of groundwater and soil at concentrations that exceed applicable standards constitutes an injury to natural resources. *See* 43 C.F.R. §§ 11.62(c) and 11.62(e).

23. The persons liable for response costs and natural resource damages under 42 U.S.C. § 9607(a) include: (i) current owners and operators of a facility and (ii) owners and operators of a facility at the time of disposal of hazardous substances. "Persons" includes individuals and corporations. 42 U.S.C. § 9601(21).

5

24. 42 U.S.C. § 9613(g)(2) provides that in an action for response costs or natural resource damages, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding in any subsequent action or actions to recover further response costs or damages."

**New York Public Nuisance Law**

25. Plaintiffs' Second Claim for Relief is based on New York common law and New York Real Property Actions and Proceeding Law § 841, and seeks to recover funds that the State has spent and will spend abating the public nuisance resulting from contamination at the Site.

26. A public nuisance is a condition that offends, interferes with, or causes damage to the public in the exercise of rights common to all, in a manner such as to, among other things, endanger or injure the property, health, safety, or comfort of a considerable number of persons.

27. Persons who cause or contribute to the creation or maintenance of a public nuisance are strictly, and jointly and severally, liable for its abatement.

## FACTUAL ALLEGATIONS

**Site Overview**

28. The Site is located at 435 South Main Street, Freeport, Nassau County, New York and identified on the Nassau County tax map as Section 62, Block 45, Lots 144, 145, and 158.[3]

29. The Site occupies approximately 1.05 acres and on its eastern side borders Freeport Creek, a tidal estuary that connects with Long Island Sound. As of 2012 the Site included two buildings, one of which was used for office space and the other which was used for boat repair and maintenance services.

---

[3] The precise geographical boundaries and identifying numbers of the tax lots that comprise the Site have changed since the 1960s.

6

**Metal Manufacturing Operations at the Site**

30. Operations at the Site from approximately 1966 through 1999 included etching and anodizing processes to manufacture metal products that were resistant to corrosion and could be decorated. The processes included the use of nickel, chromium, copper, zinc, and other metals, as well volatile organic chemicals as cleaning solvents. Management of waste from these and other hazardous substances was a necessary component of the manufacturing processes.

31. Several entities owned the Site during this time. Non-party Frederick J. Valentine, Jr. owned the Site from 1966 through 1969. Non-party 435 South Main Street Corp. owned the Site from 1969 through 1983. Non-party 435 Freeport Creek Properties Inc. owned the Site from 1983 through 1986. Gloria Stern and Miriam Sommerfield owned the Site as partners from 1986 through 1987. Freeport Creek Associates Partnership purchased the Site in 1987, and on information and belief Freeport Creek Associates, LLC currently owns the Site.

32. Metal Etching Co. ended its business operations at the Site in or around 1999.

**Contamination and Remediation of the Site**

33. Metals, volatile organic chemicals, and other hazardous substances were disposed in various locations at the Site during the course of metal manufacturing operations. Some releases of hazardous substances were reported to DEC, and DEC enforced hazardous waste management regulations at the Site, including an enforcement action that was resolved in April 1999.

34. On information and belief, sometime in 1999 Freeport Creek Associates, LLC entered into discussions with non-party Main Street Marine Inc. ("Main Street Marine") about a possible sale of the Site.

35. On information and belief, in connection with a possible sale, Metal Etching Co. conducted an environmental investigation of the Site in July 1999. The investigation found that nickel, chromium, copper, zinc, and other metals in soil and groundwater at the Site exceeded DEC guidance levels.

36. DEC "guidance levels" and other criteria protect human health and the environment by establishing legal limits on hazardous substances in groundwater, soil, and sediment.[4]

37. The New York State Department of Health has also established similar criteria for assessing hazardous substances in indoor air.

38. A report issued after the 1999 investigation recommended additional testing for a more complete understanding of contamination at the Site.

39. In May 2000, two months before leasing the Site, Main Street Marine tested for contamination in the concrete slab in one of the buildings in which Metal Etching Co. had conducted its business. The testing again revealed nickel, chromium, copper, and zinc in concentrations that would exceed DEC guidance levels for soil. Main Street Marine forwarded the testing results to DEC.

40. In or around July 2001, DEC listed the Site as Site No. 130110 in the "Registry of Inactive Hazardous Waste Disposal Sites in New York State," and designated it as a "Class 2" site, indicating that it poses a significant threat to the public health or environment and remedial action is required.

---

[4] DEC guidance levels and other criteria that were applicable at the time of the environmental investigations discussed in this Complaint have been replaced in part by a different regulatory framework.

8

41. In 2002, DEC contacted Freeport Creek Associates, LLC, Metal Etching Co., and other potentially responsible parties and asked them to enter into administrative consent orders pursuant to which they would clean up the Site. DEC's efforts were not successful.

42. In or about March 2003, DEC approved the use of the "hazardous waste remedial fund," also know as the State Superfund, for responding to the releases of hazardous substances. The Site was approved for referral to the State Superfund program for the development and implementation of a state-funded remedial program.

43. DEC conducted its remedial investigation at the Site from approximately May 2004 through March 2005.

44. In March 2005, DEC implemented interim remedial measures—which are called "removal" actions under CERCLA, 42 U.S.C. § 9601(23)—at the Site to address the threat of inhalation of volatile organic chemicals in the two on-Site buildings from soil gas escaping from below the buildings. Those measures consisted of installing sub-slab depressurization systems under the buildings, which provided migratory pathways for contaminants in the soil gas to escape into ambient air outside of the buildings.

45. In January 2007, DEC issued a Remedial Investigation Report and a Feasibility Study Report (the "RI & FS"). The purposes of the RI & FS were to evaluate the nature and extent of groundwater, soil, soil vapor, and sediment contamination, and identify and evaluate remedial actions, *i.e.*, permanent remedies for contamination at the Site. *See* 42 U.S.C. § 9601(24).

46. The RI & FS found several types of contamination above DEC guidance levels, including: (i) the volatile organic chemicals tetrachloroethene, also known as perchloroethylene ("PCE"), and trichloroethene ("TCE"); and (ii) the metals nickel, chromium, copper, and zinc.

9

The findings were as follows:

- <u>Soil</u>:  Metals, including nickel, chromium(VI), copper, and zinc, ubiquitously contaminated Site soil, and PCE, TCE, and other VOCs were concentrated in a few areas at the Site.

- <u>Groundwater</u>:  PCE, TCE, and chromium(VI) and other metals were found in groundwater in multiple locations across the Site.

- <u>Sediment</u>:  Nickel, chromium, and zinc were found in sediment in Freeport Creek.

47. PCE and TCE were also found in soil gas in the air spaces in the soil at the Site, including under the two on-Site buildings. This contamination was being addressed by the sub-slab depressurization systems that were previously installed.

48. All of the above types of contamination are consistent with the locations in which metal manufacturing operations were conducted at the Site.

49. The EPA has designated all of the foregoing as hazardous substances. 40 C.F.R. § 302.4.

50. The EPA has found that PCE likely is carcinogenic. Short-term acute exposures to PCE can cause dizziness, headaches, unconsciousness, and even death. Longer-term exposures to lower levels of PCE can cause changes in mood, memory, and vision. *See* Agency for Toxic Substances and Disease Registry ("ATSDR") Fact Sheet, October 2014.

51. Short-term exposure to high concentrations of TCE can cause dizziness, headaches, lack of coordination, unconsciousness, and even death. Longer-term exposure to moderate amounts of TCE can cause changes in mood, memory, and vision. *See* ATSDR Fact Sheet, October 2014.

52. Exposure to large amounts of nickel can cause reduced lung function, chronic bronchitis, stomach aches, and adverse effects in the kidneys and blood. Nickel can also cause rashes and asthma attacks. *See* ATSDR Fact Sheet, August 2005.

53. The EPA has found that chromium(VI), a chromium compound, is carcinogenic. Exposure to chromium(VI) and other chromium compounds can also irritate the nose and cause breathing problems and skin ulcers. *See* ATSDR Fact Sheet, October 2012.

54. Exposure to high levels of copper can cause irritation of the nose and throat, as well as vomiting, diarrhea, nausea, kidney damage, and even death. *See* ATSDR Fact Sheet, September 2004.

55. Short-term exposure to high levels of zinc can cause stomach cramps, nausea, and vomiting. Longer-term exposure to zinc can also affect cholesterol levels. *See* ATSDR Fact Sheet, August 2005.

56. DEC issued a "Proposed Remedial Action Plan" for the Site in February 2007. The Proposed Remedial Action Plan outlined the remedial actions that DEC proposed to take.

57. DEC held a public meeting on or about March 1, 2007 to discuss and hear comments from the public regarding the proposed remedial actions. DEC also received comments from the public during a public comment period that ended on or about March 12, 2007. DEC responded to the comments in its "Record of Decision" ("ROD") for the Site.

58. In March 2007 DEC issued its ROD, which described DEC's selected remedial actions for the Site. Those remedial actions included: (i) excavation of contaminated soils to the depth of the groundwater table; (ii) placement of asphalt or another cover over contaminated soil in areas where access for excavation was impeded; (iii) removal of contaminated sediment from Freeport Creek; (iv) continued operation of the sub-slab depressurization systems under

the two on-Site buildings; and (v) ongoing monitoring and controls, including monitoring of groundwater and soil gas.

59. From March through June 2008, DEC conducted a supplemental Site investigation to collect further data regarding the extent of contamination, and in preparation for designing remediation plans. This investigation did not result in findings significantly different from the earlier remedial investigation.

60. DEC completed the excavation of contaminated soils, placement of a cover over soils that were not excavated, and removal of contaminated sediment from Freeport Creek in approximately February 2012.

61. Engineering and institutional controls were also implemented at the Site. These controls included continued monitoring of groundwater and soil gas; continued operation of the sub-slab depressurization systems; restriction of the Site for commercial or industrial use; an environmental notice providing DEC with access to the Site to evaluate the ongoing measures; and reporting requirements.

62. In April 2014, DEC reclassified the Site from Class 2 to Class 4, meaning that the remedial program had been completed, but the Site required continued management.

63. As of September 21, 2016, the State had incurred costs of approximately $2,812,956.20 in responding to the release and threatened release of hazardous substances at the Site. This sum does not include costs incurred since September 21, 2016 for ongoing monitoring and other controls, or costs incurred by the Department of Health.

64. The response actions that the State has taken and will take to respond to the release of hazardous substances at the Site are not inconsistent with the "national contingency plan," 40 C.F.R. Part 300.

65. The release of hazardous substances into the environment at the Site has damaged the natural resources of the State, including its soil, groundwater, and sediment.

## FIRST CLAIM FOR RELIEF
## COST RECOVERY UNDER CERCLA
### (Against All Defendants)

66. The State hereby incorporates by reference the allegations contained in Paragraphs 1 through 65 as if fully set forth herein.

67. The Site is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

68. Buildings, structures, and equipment where hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located at the Site are also "facilities" under 42 U.S.C. § 9601(9).

69. There have been "releases" or threatened "releases" of "hazardous substances," as those terms are defined in 42 U.S.C. §§ 9601(14) and (22), at and from the Site and other facilities at the Site into the environment.

70. Among the hazardous substances that were released and are threatened to be released into the environment at and from the Site and other facilities at the Site are PCE, TCE, nickel, chromium, copper, and zinc.

71. PCE, TCE, nickel, chromium, copper, and zinc contaminated the "environment" within the meaning of 42 U.S.C. § 9601(8).

72. The State has incurred costs, and will continue to incur costs, to "respond," as that term is defined in 42 U.S.C. § 9601(25), to the release and threatened release of PCE, TCE, nickel, chromium, copper, and zinc at and from the Site and other facilities at the Site, including costs to assess, monitor, evaluate, oversee, and conduct "removal actions" and/or "remedial actions," as those terms are defined in 42 U.S.C. §§ 9601(23) and 9601(24).

13

73. 42 U.S.C. § 9607(a) provides that persons who: (i) are current owners or operators of a facility and (ii) were owners or operators at the time that hazardous substances were disposed shall be liable for the costs of removal and remedial actions that are "not inconsistent with the national contingency plan."

74. The State's removal and remedial actions at the Site are not inconsistent with the national contingency plan.

75. Defendants are all "persons" within the meaning of 42 U.S.C. § 9601(21).

76. P.A. Industries managed, directed, or otherwise conducted operations at the Site and other facilities at the Site, including operations specifically related to the disposal of hazardous substances and decisions about compliance with environmental laws and regulations, when hazardous substances were disposed at the Site, and thus was an operator of the Site at the time of disposal within the meaning of 42 U.S.C. § 9607(a)(2).

77. Metal Etching Co. was an operator of the Site at the time of disposal within the meaning of 42 U.S.C. § 9607(a)(2).

78. Arthur Schutzman and Alan Stern managed, directed, or otherwise conducted operations at the Site and other facilities at the Site, including operations specifically related to the disposal of hazardous substances and decisions about compliance with environmental laws and regulations, when hazardous substances were disposed at the Site, and thus were operators of the Site at the time of disposal within the meaning of 42 U.S.C. § 9607(a)(2).

79. Gloria Stern and Miriam Sommerfield owned the Site and other facilities at the Site as partners when hazardous substances were disposed, and thus were owners of the Site and other facilities at the Site at the time of disposal within the meaning of 42 U.S.C. § 9607(a)(2).

80. Freeport Creek Associates Partnership owned the Site and other facilities at the Site when hazardous substances were disposed, and thus was an owner of the Site and other facilities at the Site at the time of disposal within the meaning of 42 U.S.C. § 9607(a)(2).

81. Freeport Creek Associates, LLC currently owns the Site and other facilities at the Site and thus is a current owner of the Site and other facilities at the Site within the meaning of 42 U.S.C. § 9607(a)(1).

82. Pursuant to 42 U.S.C. § 9607(a), all Defendants are strictly, and jointly and severally, liable to the State for past response costs incurred by the State as a result of the release or threatened release of hazardous substances at and from the Site and other facilities at the Site.

83. Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g), all Defendants are strictly, and jointly and severally, liable for future response costs incurred by the State as a result of the release or threatened release of hazardous substances at and from the Site and other facilities at the Site.

84. The release of hazardous substances at and from the Site and other facilities at the Site has caused "injury to, destruction of, or loss of natural resources" of the State within the meaning of 42 U.S.C. § 9607(a).

85. Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g), all Defendants are strictly, and jointly and severally, liable for the State's natural resource damages, including the costs of assessing the injury to, destruction of, or loss of the natural resources.

## SECOND CLAIM FOR RELIEF
## <u>RESTITUTION</u>
### (Against All Defendants)

86. The State hereby incorporates by reference the allegations contained in Paragraphs 1 through 85 as if fully set forth herein.

87. The release of hazardous substances at and from the Site into the environment, including soil, groundwater, and sediment at the Site, constitutes a public nuisance endangering public health and safety.

88. All Defendants participated in the creation and/or maintenance of this public nuisance.

89. All Defendants had and have a duty to abate this public nuisance and to remediate the contamination.

90. All Defendants have failed to do so.

91. The State has discharged and will continue to discharge the duty of all Defendants to abate this nuisance and to remediate the contamination.

92. By discharging the duty of all Defendants to abate this nuisance and to remediate the contamination, the State has conferred a benefit upon and unjustly enriched all Defendants, and all Defendants are strictly, and jointly and severally, liable to the State in restitution for the value of the benefit conferred upon them by the State.

## **PRAYER FOR RELIEF**

WHEREFORE, the State requests judgment in its favor and against all Defendants, upon the claims set forth above, and requests that this Honorable Court enter judgment against all Defendants, as follows:

1. Declaring all Defendants to be strictly, and jointly and severally, liable to the State under CERCLA for, and awarding to the State, all costs and expenses, including interest, attorneys' fees, and other costs of enforcement incurred by the State in responding to the release or threat of release of hazardous substances at and from the Site and other facilities at the Site, and damages to the State's natural resources, including the costs of assessing the injury to, destruction of, or loss of the natural resources.

2. Declaring all Defendants to be strictly, and jointly and severally, liable to the State under CERCLA for all future response costs and expenses, including interest, attorneys' fees, and other costs of enforcement to be incurred by the State in responding to the release or threat of release of hazardous substances at and from the Site and other facilities at the Site, and future damages to the State's natural resources, including the costs of assessing the injury to, destruction of, or loss of the natural resources.

3. Declaring all Defendants to be strictly, and jointly and severally, liable to the State in restitution, and awarding to the State all past and future costs and expenses, including interest, attorneys' fees, and other costs of enforcement incurred by the State in abating the public nuisance at and in the vicinity of the Site.

4. Ordering such other and further relief, in law or in equity, as the Court deems just and proper.

Dated: New York, New York
       February 28, 2017

                    ERIC T. SCHNEIDERMAN
                    Attorney General of the State of New York
                    Attorney for Plaintiffs

                  By: /s/Matthew J. Sinkman
                      Assistant Attorney General
                      Environmental Protection Bureau
                      120 Broadway, 26th Floor
                      New York, New York 10271
                      (212) 416-8279
                      Matthew.Sinkman@ag.ny.gov